**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE DETAINED MATERIAL WITNESS SEAFARERS SEUNG-HYUN LEE, HYEON TEA KIM, AND TAEJUN SON** | **Case: 1:16-mc-00961**<br>**Assigned To : Chutkan, Tanya S.**<br>**Assign. Date : 5/3/2016**<br>**Description: Miscellaneous** |

### MOTION TO AMEND THE CONDITIONS OF RELEASE OF MATERIAL WITNESSES OR IN THE ALTERNATIVE TO ORDER DEPOSITIONS OF WITNESSES PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 15(a)(2)

MOVANTS Seung-Hyun Lee, Hyeon Tea Kim, and Taejun Son, by and through their undersigned attorney, hereby move this Court to amend the conditions of their release pursuant to 18 U.S.C. § 3142(c)(3) of the Bail Reform Act, or in the alternative to order the taking of their depositions in the above-captioned matter pursuant to Federal Rule of Criminal Procedure 15(a)(2).

### STATEMENT OF FACTS

**I.     THE MATERIAL WITNESSES**

The movants, Seung-Hyun Lee, Hyeon Tea Kim, and Taejun Son, (collectively "Movants") are former crew members of the F/V PACIFIC BREEZE ("PACIFIC BREEZE") that have been detained in the jurisdiction of the United States since July 2015 in connection with a United States Coast Guard ("USCG" of "Coast Guard") and U.S. Department of Justice ("DOJ") investigation into alleged violations of the Act to Prevent Pollution from Ships 33 U.S.C. § 1901 *et seq.* ("APPS"). Movants are not targets of the investigation, but upon sealed motion filed by DOJ, on April 6, 2016, they were declared

**RECEIVED**

MAY - 3 2016

Clerk, U.S. District and
Bankruptcy Courts

material witnesses in the above-captioned matter pursuant to 18 U.S.C § 3144. They are

citizens of the Republic of South Korea ("South Korea") and held various positions on the

PACIFIC BREEZE:

- Lee, 26 years old, was the Chief Officer. His duties included navigating the vessel and searching the water for evidence of fish. He has been detained in the United States for over nine months and has been isolated from family and friends and his normal way of life. His sister is getting married this year and has already postponed her wedding once so that he can play a role in it. Mr. Lee is currently under the care of a Korean-speaking psychiatrist (Dr. Hon) for depression-like symptoms he has experienced as a result of his prolonged detention in the U.S. Moreover, at the material witness hearing on April 6, 2016, the United States represented to the Court that Mr. Lee is not a material witness to their case; rather, the United States named him a material witness at the request of Defendant Jeong Seon Han.

- Kim, 41 years old, was the Fishing Master. He led the crew's fishing operations. He has been detained in the United States for over nine months and like Lee is isolated from family and friends and his normal way of life. He provides the sole financial support for his wife and 3 children. His eight-year old daughter is distraught about her father's indefinite absence and has sought counselling to deal with her anxiety over his absence. Mr. Kim is very concerned about his daughter's well-being and he too is under the care of Dr. Hon for depression-like symptoms which he has experienced as a result of his prolonged detention.

- Son, 22 years old, was the Apprentice Second Engineer. His duties included supporting fishing operations and monitoring equipment in the engine room for temperature and pressure. He too has been detained in the United States for over nine months and is isolated from family and friends and his normal way of life.

Movants are currently detained in McLean, Virginia and are not free to leave the

D.C. metropolitan area. They do not have United States' citizenship or a work visas and

by law are unable to work or earn an income in this country. Movants have been given a

meal allowance and regular salary, but the customary practice for contract employees on

fishing vessels is to pay employees based on the catch of the vessel with higher ranking

crew receiving the bulk of their earnings from the catch. Due to their detention, Movants

and in particular first mate Lee and fishing master Kim, have lost the bulk of their earnings over the last nine months. Moreover, two of the Movants, Lee and Kim, are currently under a psychiatrist's care for depression-like symptoms which have intensified due to their prolonged detention and uncertainty of when they will be able to resume their normal lives again.

## II.     THE INVESTIGATION

The PACIFIC BREEZE is a fishing vessel owned by Pacific Breeze Fisheries, LLC (the "Company"). On or about June 30, 2015, the PACIFIC BREEZE arrived in American Samoa where it planned to unload its catch of fish and go to dry dock for maintenance. On or about July 7, 2015, the Coast Guard boarded the PACIFIC BREEZE for a scheduled inspection. After the initial inspection, the USCG conducted an expanded investigation of alleged violations of the APPS based on its suspicion that the vessel's oil water separation equipment was not regularly being used and that certain bilge discharges were not recorded in the vessel's Oil Record Book ("ORB"). A false material entry or omission in the ORB could subject the captain of the vessel or other person having charge of the ship with failing to maintain an accurate ORB under 18 U.S.C. § 1001 or 33 U.S.C. § 1907(a). *See U.S. v. Fafalios*, No. 15-30146, 2016 U.S. App. LEXIS 4658 (5th Cir., Mar. 14, 2016). The expanded USCG investigation took several weeks and eventually involved criminal investigators from the Coast Guard Investigative Service, as well as testing and seizure of documents and equipment. Significantly, the USCG's own investigation revealed that none of the Movants operated or assisted with the operation of the vessel's oil water separator or other equipment that required entries in the ORB. Further, none of the Movants made any entries in or even

3

handled the ORB. Two movants, Lee and Kim, were deck crew and rarely stepped foot in the engine room where the oil water separator was operated and the ORB was kept. Movants' connection to the alleged violations here is marginal at best.

As a result of the investigation, on September 3, 2015, the Company entered into an Agreement on Security (the "Agreement") with the United States. (Exhibit A). Under the Agreement, the United States allowed the PACIFIC BREEZE to be released to the Company in exchange for posting a surety bond of Four Hundred Thousand Dollars ($400,000.00). This Agreement also identified eight crewmembers that purportedly had information relevant to the investigation and were required to stay behind on American Samoa pending the Coast Guard's investigation into the PACIFIC BREEZE. These eight crew members are Michael Thomas Sundquist, Taebong Jeong, KiChul Jun, Jeong Seon Han, Hyeon Park, and the three Movants. On or about October 25, 2015, the Company transported all these crewmembers except Michael Sundquist,[1] to an apartment house in McLean, Virginia. The Movants have been de facto detained since July 7, 2015 and have been living at an apartment in McLean, Virginia since October 25, 2015.

The Movants, along with two other deck crew members, provided interviews to the government on November 16, 2015, during which DOJ attorneys Kenneth Nelson and Brendan Selby, and USCG Special Agent Candi Meyers, asked extensive questions of each witness. Since those interviews, Movants have been continuously available to participate in other interviews; however, the United States has not elected to request anything further of these crewmembers other than that they remain in the U.S. indefinitely.

---

[1] Sundquist is a United States citizen who resides in Sarasota, Florida. He has not been detained by the government although the government has requested that they be informed if he takes new assignments at sea.

Despite only interviewing Movants once, the United States moved for a material witness summons as to all three individuals on March 28, 2016. Movants were ordered to appear before this Court regarding that motion on April 6, 2016, nearly nine months after they were first detained in American Samoa. At that hearing, Movants were declared material witnesses and ordered to follow certain conditions upon release. The conditions were: (1) Movants are to remain under the supervision of Candi Meyers of the USGC Investigative Service; (2) Movants are not to be in possession of their passports; (3) Movants are to remain in the area of the District of Columbia; (4) Movants are required to return to this Court for any necessary appearance; and (5) Movants are to comply with the terms of any subpoena in this matter.

On April 6, 2016, the United States also issued a complaint against Jeong Seon Han, former Chief Engineer of the PACIFIC BREEZE for alleged violations of APPS. An indictment was entered against Jeong Seon Han on April 27, 2017. Despite the Movants' lack of knowledge of the events under investigation, there is no indication that the government intends to agree to their release back to South Korea anytime soon.

## ARGUMENT AND CITATION TO AUTHORITIES

### I.     UNDER THE BAIL REFORM ACT, THE DETAINED SEAFARERS SHOULD BE ALLOWED TO RETURN TO SOUTH KOREA AS A CONDITION OF THEIR RELEASE.

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). This is true for charged defendants, but it is even more so with mere witnesses to a crime. Movants have been charged with no crime, and their connection to the event under investigation is marginal at best. They have been held for nine months against their will in a foreign country

5

isolated from friends and family. Due to this prolonged detention, Movants and their loved ones have suffered extraordinary (and escalating) distress, anxiety, and hardship. Movants' continued detention is an unconstitutional affront to their liberty.

The Material Witness Statute permits a judicial officer to arrest a material witness and treat the witness in accordance with the Bail Reform Act (the "Act"). 18 U.S.C. § 3144. The Act creates a strong policy in favor of release on personal recognizance. *Wood v. United States*, 391 F.2d 981, 983 (D.C. Cir. 1968).[2] It is only if "such a release would not reasonably assure the appearance of the person as required" that other conditions of release may be imposed. *Id.* (citation omitted); *see* 18 U.S.C. §3142(b), (c). Such conditions must be the "least restrictive." 18 U.S.C. § 3142(c)(1)(B). To determine the appropriate conditions of release, the Act asks the court to consider four factors: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device; (2) the weight of the evidence; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, and whether at the time of the current offense or arrest, the person was on a conditional release; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). Alien status is not a listed factor or criterion. *United States v. Ong*, 762 F. Supp. 2d 1353, 1360 (N.D. Ga. 2010).

---

[2] *Wood* cites a previous but substantially similar version of the Act.

These factors weigh in favor of releasing the Movants on their own recognizance and allowing them to return to South Korea until they are needed in court. None of the crimes being investigated are crimes of violence, terrorism, or involve a minor victim, a controlled substance, firearm, explosive, or destructive device. The discharges of bilge water under investigation occurred half way around the world well outside United States' jurisdictional waters, and their only connection to a substantive United States crime is through a failure to record or a false recording of the discharges in the ORB. This recordkeeping offense is hardly the type of serious felony crime for which the Act intended detention. *See* S. Rep. No. 98-225, at 12–13 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195–96 (discussing dangerousness as a consideration of release). Further, the weight of the evidence of a violation is not compelling in that the government has no whistleblower who observed a discharge of oil in violation of APPS, has no tank sounding records to indicate that ORB entries related to the oil water separator are false, and has no recordings from an oil content meter to verify or contradict regular use of the vessel's oil water separator. The Movants also have no testimony relevant to the government's investigation. None ever operated the oil water separator or discharged any bilge water from the vessel. In fact, two Movants, Lee and Kim, did not even work in the engine room where the bilges are located and the ORB is maintained. Movants are not targets of the investigation, nor do they have they any criminal record or pose any danger to the community. The only thing they lack with respect to their release are significant ties to the community; however, by placing certain reasonable conditions on their release to South Korea as outlined below, this Court can alleviate any parties' concern about their return if needed. Accordingly,

7

Movants believe that the "least restrictive" conditions of release allow for their immediate return to South Korea until their presence is necessary at a future proceeding.

Movants believe that the following four conditions of release will provide adequate assurances that they will be available to appear for court proceedings related to this matter and as requested by any of the parties. First, although the Movants are seafarers by trade, they are willing to surrender their seafarer's licenses pending the trial to provide assurances of their return. Movants sole adult occupation has been as seafarers, and without the license they would be unable to apply for or obtain future employment in their trade. This alone should prove enough incentive for their return to the United States. This condition also prevents them from boarding another ship. As a result, Movants will be readily available to fly back to Washington D.C. as needed. Second, the Company has entered into an agreement to employ all three Movants and pay for their travel to the United States to testify "in connection with any trial or legal proceedings arising from the United States [DOJ's] investigation into conduct aboard the [PACIFIC BREEZE]." Agreements to Employ Lee, Kim, and Son (respectively Exhibits B, C and D). Third, Movants are willing to consider the posting of a reasonable bond as an additional collateral for their return. Finally, Movants have affirmed in declarations filed with this motion that they will return to the United States to testify in future proceedings as necessary. *See* Declaration of Seung-Hyun Lee, (Attachment A), Declaration of Hyeon Tea Kim (Attachment B), Declaration of Taejun Son (Attachment C).

Imposing these conditions and allowing the Movants to return home is simply the right thing to do. Consider the plight of an American citizen with no ties to South Korea who had committed no crime and whose sole reason for detention was the South Korean

government's belief that he or she had a marginal relevance to a non-violent recordkeeping crime in South Korea. One would hope that a South Korean court would not detain this American citizen for any length of time, but allow him to return to the United States with reasonable assurances that he would return to South Korea if needed for a court appearance. Movants contend that the same consideration should be given them as they face the same plight in the United States.

This Court has sufficient authority to fashion such terms of release as the Act does not demand "absolute certainty," only reasonable assurance. *United States v. Alston*, 420 F.2d 176, 178 (D.C. Cir. 1969). Movants three aforementioned concessions, plus their own personal declarations that they will return to the United States as needed, are more than enough to reasonably insure their appearance. Therefore, Movants ask the Court to amend the conditions of release by returning their passports and allowing them to return to South Korea – their home and families – until they are needed to provide testimony.

**II.      IF THE DETAINED SEFARERS ARE NOT ALLOWED TO RETURN TO SOUTH KOREA AS A CONDITON OF RELEASE, MOVANTS' REQUEST THAT THEIR RULE 15(a)(2) DEPOSITIONS BE TAKEN IN THE INTEREST OF JUSTICE AND THAT THEY BE ALLOWED TO LEAVE IMMEDIATELY AFTER HAVING SIGNED UNDER OATH THEIR DEPOSITION TRANSCRIPT.**

If the Court is unwilling to amend Movants' conditions of release to allow for their immediate return home to South Korea, Movants respectfully request that the Court compel the taking of Movants' Rule 15(a)(2) depositions. Much of the same reasoning above applies to this request. For nine months, Movants have been detained in the United States away from their family, friends, culture, and homeland. They have been forced to live in a foreign country where they do not know the language, cannot lawfully hold a job, and cannot see family, friends, or relatives. They are suffering personal, psychological and

financial hardship as a result of their prolonged detention. Movants have a liberty interest in avoiding continued detention. *In re: Grand Jury Proceedings, Re: Investigation of Blow Wind Shipping, S.A.*, No. 10-mj-57-P-JAR, 2010 U.S. Dist. LEXIS 144359, at *6 (D. Me. Apr. 16, 2010).

### A. This Court has Broad Discretion to Order Rule 15(a)(2) Deposition.

A court may order a deposition to be taken under Rule 15(a)(2) if it is in the "interest of justice." *United States v. Maniatis*, No. 07-CR-00024, 2007 U.S. Dist. LEXIS 47543, at *4 (E.D. Cal. June 20, 2007). The Material Witness Statute states:

> No material witness may be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and if detention is not necessary to prevent a failure of justice. Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.

18 U.S.C. § 3144. Rule 15(a)(2), which is applicable here, works in conjunction with the Material Witness Statute.[3] *United States v. Dalnave Navigation*, No. 09-130, 2009 U.S. Dist. LEXIS 21765, at *2 (D.N.J. Mar. 18, 2009); *see* Act of Oct. 12, 1984, Pub. L. No. 98-473, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3211 ("[T]he Committee stresses that whenever possible, the depositions of witnesses should be obtained so that they may be released from custody."). Rule 15(a)(2) provides:

> A witness who is detained under 18 U.S.C. § 3144 may request to be deposed by filing a written motion and giving notice to the

---

[3] "[Rule 15(a)(2)] does not require the material witness 'to establish "exceptional circumstances" as a predicate for a court-order deposition'," unlike a motion under Rule 15(a)(1). *Mercator Lines Ltd, in rem, Re: Seafarer Witness Prastana Taohim*, Misc. No. 11-00024-CG-C (S.D. Ala. Oct. 25, 2011) (citing *United States v. Santos*, No. 10-10031-CR, 2011 U.S. Dist. LEXIS 32942, *3 (S.D. Fla. Mar. 29, 2011)). Rule 15(a) contains two subsections, under which an entity may move a court for a deposition. A *party* may move under Rule 15(a)(1) and a *material witness* may move under Rule 15(a)(2). Only the former requires "exceptional circumstances" as a predicate for a court-ordered deposition. The latter – at issue here – requires the movant to show that the interest of justice warrant deposition. *Maniatis*, 2007 U.S. Dist. LEXIS 47543, at *4.

> parties. The court may then order that the deposition be taken and
> may discharge the witness after the witness has signed under oath
> the deposition transcript.

Fed. R. Crim. P. 15(a)(2). The decision to grant a motion to take a deposition rests with

the sound discretion of the trial court and will not be overturned absent a clear abuse of

discretion. *See United States v. Ismaili*, 828 F.2d 153, 159 (3d. Cir. 1987), *cert. denied*,

485 U.S. 935 (1988).

### B. Movants Have Standing to Be Deposed Under Rule 15(a)(2).

Movants have standing to have their depositions taken under Rule 15(a)(2) because

they are detained in an apartment in McLean, Virginia.[4] *See* Fed. R. Civ. P. 15(a)(2) ("A

witness who is *detained* . . .") (emphasis added). They do not possess their passports, have

no means of transportation, are in a foreign county where they do not speak the language,

and are now regularly monitored by representatives of the USCG. These hallmarks of

detention are comparable to similar cases where such facts were sufficient for standing.

*See, e.g.*, *Blow Wind*, U.S. Dist. LEXIS 144359 at *4 (". . . kept away from their homes, in

a foreign country where they do not speak the language and have no social connections and

no way to engage in the line of work in which they are experienced . . ."); *Mercator*, 2007

U.S. Dist. LEXIS 47543, at *8 (seafarer functionally detained when "his passport has been

taken pursuant to an indefinite agreement . . . to which petitioner is not a signatory, he is

holed up in a hotel without his consent and without the ability to leave the country . . . ,

and he is being kept from his home and family . . . in a country where he speaks (and

---

[4] As previously stated, the United States has named all three Movants as witnesses in this matter, and this proceeding is unquestionably criminal in nature. Therefore, the other prerequisites for standing under Rule 15(a)(2) are satisfied.

understands) very little of the language."). That Movants are currently detained and can therefore avail themselves to Rule 15(a)(2) is without question.

### C. The Court Should Compel Rule 15(a)(2) Depositions as soon as Practicable upon Hearing on this Motion.

The Court should compel Movants' Rule 15(a)(2) depositions as soon as practical after the hearing on this motion. Indeed, Movant's detention will reach the maximum allowable time supported by precedent by the time depositions can reasonably be scheduled. At least three other federal jurisdictions have set time limits for the holding of material witnesses: 45 days, *Aguilar-Ayala v. Ruiz*, 973, F.2d 411 (5th Cir. 1992) (affirming order of the Southern District of Texas); 60 days, *United States v. Allie*, 978 F.2d 1401, 1403 (5th Cir 1992) (affirming order of the Western District of Texas); 60 days, *Blow Wind*, U.S. Dist. LEXIS 144359 at *9. Here, the Movants have been detained since on or about July 7, 2015. They have been in the United States since October 25, 2015. And, they have were declared material witnesses on April 6, 2016. It is now May 3, 2016. By the time all responses and replies are filed, a hearing is held, and depositions are scheduled, the 60-day maximum holding time for detention will likely be reached, if not exceeded. Accordingly, the Court should order the taking of Movants' depositions as soon as practical, but no more than two weeks after hearing on this motion.

The subject matter is also appropriate for Rule 15(a)(2) depositions. Several courts have ordered Rule 15(a)(2) depositions for witnesses in comparable cases involving USCG investigations of seafaring vessels. For example, in *Maniatis*, the court ordered the Rule 15 deposition of a foreign seafarer whom had been detained in the United States for several months, unable to work or send money home to his family. 2007 U.S. Dist. LEXIS 47543, at *3–4. Likewise, in *Dalnave*, the court ordered Rule 15 deposition of crewmembers that

had been confined to a hotel and prohibited from leaving the country for months. 2009 U.S. Dist. LEXIS 21765, at *5–6. Just like the witnesses in *Maniatis* and *Dalnave*, Movants face indefinite personal and financial hardship at this time. Movants are sequestered in a house in a foreign country where they do not speak the language, cannot work, and cannot earn money for their families. Their lives are on hold – indefinitely so. Their families and friends ache for their return. Two Movants, Lee and Kim, are currently under a psychiatrist care for depression like symptoms related to their prolonged detention, and Kim's eight year old daughter is also seeking care for anxiety related to her father's detention. And yet, they remain detained in a foreign county with no end in sight.

Movants have already experienced undue hardship by being detained for nine months. Requiring them to remain indefinitely until pendency of trial would create undue and personal, psychological, and financial hardship. While the government may represent to the Court that it will move post haste in this case and that it will expedite discovery or take other measure to insure a speedy trial, as the Court knows, despite parties best efforts, trial dates are often continued. For example in this case, it may be necessary for the defendant to seek the testimony of other South Korean crew members on board the PACIFIC BREEZE that were not detained and now reside in South Korea. Arranging for and taking these depositions in a foreign country will take time will add to the time between indictment and trial.

In short, taking Rule 15(a)(2) depositions of Movants now is in the interest of justice and the best way to insure that they will be allowed to return to their country and their families at the earliest possible moment. It is the duty of the United States to consider the rights of material witnesses and to protect their liberty interests. *Blow Wind*, U.S. Dist.

LEXIS 144359 at *at *6 (citing *United States v. Cabrera-Ruiz*, No. C-09-8, 2009 WL 819901, at *2 (S.D. Tex., Mar. 27, 2009)). Such depositions will allow the United States to preserve the Movants' testimony for trial, protect the Constitutional rights of the potential defendants to confrontation, and allow for meaningful cross-examination.

Movants therefore request that if the Court does not modify their conditions of release to allow their immediate return to South Korea, then it order the taking of Movants' depositions at the earliest possible time, but no more than two weeks after the hearing on this motion. Moreover, given the Movants' limited knowledge of the issues at the crux of this investigation (*e.g.* use of the oil water separator and recording of that use in the ORB) such depositions should be limited to three hours in length.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Movants Seung-Hyun Lee, Hyeon Tea Kim, and Taejun Son request that this Court amend their conditions of release and permit the Movants to return to South Korea. In the alternative, Movants request that this Court order the taking of their depositions in the above-captioned matter. Movants request that the depositions be scheduled as soon as practicable but no more than two weeks after the hearing on this motion, and they request that they be released to return to their homeland of South Korea upon signing under oath their deposition transcript.

Dated: May 3, 2016                          Respectfully submitted,

_____
W. BRUCE PASFIELD (DC # 495239)
Alston & Bird LLP
The Atlantic Building
905 F Street NW
Washington, DC 20004-1404

(202) 239-3585
*Attorney for Seung-Hyun Lee, Hyeon Tea
Kim, and Taejun Son*

15

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2016, I served the foregoing by faxing and mailing, by first class United States mail with adequate first class postage affixed thereon, to the following:

Frederick Yette
Assistant U.S. Attorney
United States Attorney's Office
555 4th Street, NW, 11th Floor
Washington, DC 20530
Fax Number: (202) 252-7792
*Attorney for the United States*

Kenneth E. Nelson
Trial Attorney
Environmental Crimes Section
United States Department of Justice
601 D Street, N.W., Suite 2814
Washington, D.C. 20004
Fax: (202) 305–0396
*Attorney for the United States*

Stephen Darmody
Hollingsworth LLP
1350 I Street N.W.
Washington, DC 20005
Fax: (202) 682-1639
*Attorney for Defendant Han*

W. BRUCE PASFIELD (DC #   495239)
Alston & Bird LLP
The Atlantic Building
950 F Street NW
Washington, DC 20004-1404
(202) 239-3585
*Attorney for Seung-Hyun Lee, Hyeon Tea Kim, and Taejun Son*

# EXHIBIT A

## AGREEMENT ON SECURITY

### RECITALS

A.    Pacific Breeze Fisheries, LLC ("Owner/Operator"), a United States-domiciled company with offices at 1026 Cabras Highway, Suite 219, Piti, Guam 96915, was at all relevant times the registered owner and operator of the CFV PACIFIC BREEZE (Vessel Identification Number 1212040, Call Sign WDE4890) ("the Vessel") under applicable United States law.

B.    The United States of America ("United States") asserts that the Vessel is subject to the MARPOL Protocol 73/78, the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, *et seq.*, and the Clean Water Act ("CWA"); that the Vessel violated the MARPOL Protocol 73/78, the APPS and the regulations thereunder, and other relevant laws and regulations (collectively, the "Alleged Violations"); and that a U.S. District Court may assess criminal penalties against the Vessel *in rem* or its Owner/Operator *in personam*.

C.    The United States has commenced an investigation of the Alleged Violations ("Investigation"), and in coordination and agreement with the local government in American Samoa, has affected the withholding of the Vessel's American Samoa Customs departure clearance until the Vessel provides security as authorized by American Samoa Code, Chapter 10, Section 27, specifically Section 27.1039, and in reflection of the corresponding laws of the United States, particularly 33 U.S.C. § 1908(e) and 19 C.F.R. 4.66(a).

1

D.     Owner/Operator and the United States, as parties to this Agreement, desire
to arrange for surety to be posted to secure the performance of this Agreement and to
permit American Samoa Customs Division to issue the Vessel's departure clearance.

### AGREEMENT

This Agreement in its entirety constitutes surety satisfactory to the Secretary of
Homeland Security ("Secretary") per 33 U.S.C. § 1908(e).  As consideration for surety
satisfactory to the Secretary for the release of the Vessel, the undersigned parties agree as
follows:

1.   Owner/Operator shall post a Surety Bond in the amount of $400,000 United
States Dollars (USD) as security for any potential adjudicated fines or penalties for the
offenses mentioned above and to ensure performance of this Agreement.  The Surety
Bond shall be posted prior to the Vessel's departure from Pago Pago, American Samoa,
and delivered to the U.S. Coast Guard Fourteenth Coast Guard District Legal Office, 300
Ala Moana Blvd. #9-130, Honolulu, HI 96850.  When the U.S. Coast Guard receives the
Surety Bond, and upon receipt of an executed copy of this Agreement, the U.S. Coast
Guard will promptly notify American Samoa Customs that departure clearance of the
Vessel may be granted as it relates to the Alleged Violations.  The Surety Bond shall be
paid out to the United States as provided for in the Surety Bond and as follows:

a.   Subject to any right of appeal, if a penalty is assessed by a United States court
or authorized administrative body in a civil, criminal, or administrative action
against the Vessel *in rem* or its Owner/Operator *in personam* for the Alleged
Violations, then the net amount of such penalty (or the full amount of the
Surety Bond, excluding any interest on that amount, if the penalty is in excess

of the Surety Bond) shall be paid to the United States. The balance amount of the Surety Bond and any interest earned thereon remaining in excess of the amount paid to the United States shall be remitted to Owner/Operator.

b.  If judgment is entered in favor of Owner/Operator in a criminal action, the balance of the amount of the Surety Bond and any interest earned thereon shall be paid to Owner/Operator.

c.  If Owner/Operator fails to appear as required by this Agreement, or fails to waive objections to jurisdiction as required by this Agreement, then the amount of the Surety Bond, excluding any interest earned thereon, shall be paid to the United States.

d.  If a United States court renders a finding that Owner/Operator materially breached any other obligation contained in this Agreement, then the amount of the Surety Bond and any interest earned thereon shall be payable to the United States in reimbursement for actual expenses required for performance of the aforementioned obligations by the United States as directed by the court.

e.  If a full or partial plea agreement or compromise is reached in a civil, criminal, or administrative action, then payment shall be made in accordance with joint written instructions from the United States and Owner/Operator.

Any dispute between the United States and Owner/Operator regarding payment under this paragraph shall be submitted to the United States court which hears the criminal action. In any such dispute wherein one party claims a breach of the terms and conditions herein, the party asserting that there has been a breach of the Agreement shall bear the burden of proof.

2.    Owner/Operator agrees to facilitate interviews of any officer or crewmember employed by Owner/Operator at the time such a request is made by the United States.  Owner/Operator agrees to cooperate with the United States to arrange for testimony of such employed officer or crewmember before a Grand Jury or other judicial or administrative proceeding arising from the Alleged Violations.  Owner/Operator agrees to make reasonable efforts to assist the United States in effecting proper service of process for judicial proceedings related to any Alleged Violation of Owner/Operator, officer or crewmember, addressed to any employed officer or crewmember who is not in the United States at the time the subpoena is issued, in a manner consistent with U.S. laws and the laws of the foreign country where the individuals are located.  In addition, Owner/Operator will encourage these officers and crewmembers to cooperate with the United States in carrying out its investigation and in appearing for their scheduled testimony.  No disciplinary measures or legal proceedings or any other retaliatory actions will be instituted by the Owner/Operator or any agent of the Owner/Operator of the Vessel against any officer or crewmember or other employee as a result of the officer's or crewmember's or other employee's cooperation with the United States.  No efforts will be undertaken to retaliate against the officers or crewmembers or other employees for their cooperation, either now or at any time in the future, and the Owner/Operator will make reasonable efforts to prevent third parties from the doing the same.  The United States agrees that it will provide reasonable notice of its need for these officers and crewmembers to be present so that Owner/Operator may arrange for substitute officers and crewmembers.

3.      At the request of the U.S. Coast Guard acting on behalf of the United States, the following ship's officers and crewmembers will remain within in the jurisdiction of the U.S. District Court of the District of Columbia:

      1)  SUNDQUIST, Michael Thomas -- Captain;

      2)  HAN, Jeong Seon -- Chief Engineer;

      3)  JEONG, Taebong -- First Assistant Engineer;

      4)  JUN, KiChul -- Radio Officer;

      5)  LEE, Seung Hyun -- Chief Officer;

      6)  KIM, Hyeon Tea -- First Mate;

      7)  PARK, Hyeon -- Second Officer; and

      8)  SON, Taejun -- Second Engineer.

The Owner Operator agrees to provide the financial support described below to the aforesaid crew while they are in Washington, D.C. during the pendency of the Investigation and any trial that may result therefrom and will fully provide for transportation costs to Washington, D.C. from American Samoa. Owner/Operator further agrees to provide reasonable lodging, a meal allowance of $71.00 USD per day (the U.S. Government Services Administration rate for 2015), and health care coverage to the aforementioned ship's officers and crewmembers who do not reside in the United States, while in the United States, regardless of the current employment status of the aforementioned ship's officers and crewmembers, until the United States, through its attorney responsible for the pending criminal investigation, advises that their presence is no longer necessary. For any U.S. nationals, the Owner/Operator agrees to continue to pay wages, daily meal allowance and other entitlements, and to provide transportation

and lodging as necessary, so the crewmembers or officers are available for interviews, depositions, Grand Jury, or other judicial or administrative proceedings as required by the United States. Owner/Operator agrees to immediately notify the United States, through its attorney responsible for the pending criminal investigation, as well as the U.S. Coast Guard Fourteenth District Legal Office, of the name, address, and telephone number of the hotel, or residence, where each ship's officer and crewmember resides. Owner/Operator agrees to provide notice of this Agreement and its provisions to all affected ship's officers and crewmembers. Owner/Operator further agrees that it has no objection to any officer or crewmember, whether listed above or otherwise, departing the Vessel in American Samoa, or in the jurisdiction of the United States.

Following the receipt of the Surety Bond referenced in paragraph 1, above, the United States will promptly secure appropriate immigration status for the aforementioned ship's officers and crewmembers consistent with their role as potential witnesses in the Investigation. If the appropriate immigration status has not been granted by the time this Agreement has been executed and the Vessel is ready to depart American Samoa for the remainder of its voyage, the Vessel will be permitted to depart American Samoa upon satisfaction of the following conditions: (1) Owner/Operator posts the Surety Bond; (2) Owner/Operator agrees to provide the officers and crewmembers referenced in paragraph 3 with lodging and per diem in American Samoa (if permitted by local immigration law), as well as wages and health care, until such time that immigration status has been granted and the officers and crewmembers have been transported to Washington D.C.; and (3) Owner/Operator agrees to transport these personnel to the District of Columbia as soon as practicable once the appropriate immigration status is granted.

Owner/Operator agrees that the aforementioned ship's officers and crewmembers will not be allowed to remain aboard the Vessel when it departs from American Samoa unless the United States, through its attorney responsible for the pending criminal investigation, advises Owner/Operator that any ship's officer or crewmember may leave American Samoa aboard the Vessel. Owner/Operator agrees to continue to employ and to pay total wages in a timely manner and in a manner consistent with any applicable collective bargaining agreements or employee contracts until the United States, through its attorney responsible for the pending criminal investigation, advises that their presence is no longer necessary. After being advised by the United States, through its attorney responsible for the pending criminal investigation, that the presence of an aforementioned ship's officer or crewmember is no longer necessary, Owner/Operator will repatriate the ship's officer or crewmember to his home country, as applicable, or to another port so that the ship's officer or crewmember may complete his employment contract, unless otherwise agreed or ordered by a court of competent jurisdiction. The requirements of Owner/Operator set forth in this paragraph shall continue until all related cases are declined, go to trial or depositions are taken in accordance with Federal Rules of Criminal Procedure, Rule 15, after an indictment or information has been returned.

4.     In the event the Investigation and/or any subsequent judicial proceedings resulting therefrom are brought in a jurisdiction other than the District of Columbia, Owner/Operator agrees that all obligations set forth in this Agreement shall apply during the pendency of any such judicial proceedings in a jurisdiction other than the District of Columbia

5.   The United States and Owner/Operator agree to act in good faith in carrying out all respective obligations set forth in this Agreement.

6.   The United States and Owner/Operator agree to take reasonable measures to expedite the Investigation and any subsequent administrative or judicial proceedings resulting therefrom.

7.   The United States agrees that Owner/Operator cannot exercise complete control over the ship's officers and crewmembers and therefore Owner/Operator's obligations in respect to ensuring any ship's officer or crewmember remains within or returns to the jurisdiction of the U.S. District Court of the District of Columbia shall be limited to:

a.   requesting such ship's officers and crewmembers to surrender their passports to the Vessel's agent designated by Owner/Operator for safekeeping;

b.   requesting such ship's officers and crewmembers to remain within the jurisdiction of the U.S. District Court of the District of Columbia;

c.   providing such ship's officers and crewmembers with reasonable lodging, a meal allowance and health care coverage as provided in this Agreement; and

d.   providing such ship's officers and crewmembers with reasonable transportation within the jurisdiction of the U.S. District Court for the District of Columbia, including transportation to all meetings with their attorneys and law enforcement personnel.

If such a ship's officer or crewmember refuses to surrender his passport to the Vessel's agent designated by Owner/Operator, then Owner/Operator shall immediately provide actual notice to the United States, through both its attorney responsible for the

8

pending criminal investigation, as well as the Fourteenth Coast Guard District Legal
Office. If at any time any such ship's officer or crewmember requests the return of his
passport from the Vessel's agent designated by Owner/Operator, then Owner/Operator
shall provide actual notice to the United States, through both its attorney responsible for
the pending criminal investigation, as well as the Fourteenth Coast Guard District Legal
Office, at least 72 hours before returning the passport to the ship's officer or
crewmember. Regarding such ship's officers and crewmembers, Owner/Operator shall
have no further responsibility or obligations to the U.S. Coast Guard other than those
stated herein, except as otherwise provided by law or regulation.

8.      The obligations of Owner/Operator set forth herein with respect to the
specifically aforementioned ship's officers and crewmembers are subject to all rights of
each ship's officer and crewmember as may be asserted by the ship's officer or
crewmember or by any attorney working on the behalf of said ship's officer or
crewmember.

9.      Nothing in this Agreement is to be deemed as binding on non-parties to
this Agreement. In particular, for each ship's officer and crewmember who may be
served with a federal Grand Jury, deposition, or trial subpoena or material witness
warrant and who is required to remain within the jurisdiction of the U.S. District Court
for the District of Columbia, their rights pursuant to 18 U.S.C. § 3144, F.R.Crim.P. Rule
15, and other federal laws are specifically preserved.

10.      The United States will provide an inventory of all documents, copies of
documents, or items seized from the Vessel. If they can reasonably do so,
Owner/Operator agrees to stipulate to the authenticity of documents and things listed on

the inventory provided by the United States after Owner/Operator, through counsel, have had a reasonable opportunity to review the inventory and compare it against actual documents or things referenced in the inventory. The United States agrees that by so stipulating, Owner/Operator does not waive any objections it may have to the relevance or admissibility of the documents into evidence in any proceeding, or to the manner in which they were seized and removed, or to any other matter concerning the documents or things except their authenticity at the time of their seizure. Owner/Operator also agrees to accept service of and comply with any and all subpoenas for records issued by the government and, upon request, provide a competent custodian of records at any court proceeding, to include Grand Jury, motions, and trial, to testify as to the authenticity of any records produced pursuant to the subpoena and steps taken to comply with said subpoena.

11.     Owner/Operator, and the United States agree that the criminal and civil penalty claims of the United States against the Vessel *in rem* shall attach to the Vessel's release security as provided pursuant to the Federal Rules of Civil Procedure, Admiralty, Maritime Claims, Supplemental Rule E(5). In consideration of this Agreement, the United States agrees not to cause the arrest of the Vessel, nor the arrest, seizure, or attachment of any other vessel owned, operated, managed, or chartered by Owner/Operator for the Alleged Violations, and not to withhold customs departure clearance of the Vessel, or any other vessel under the same management and control of Owner/Operator, on account of the Alleged Violations.

12.     This Agreement is to be binding whether the Vessel be in port or not in port, lost or not lost, and regardless of its condition, and is given without prejudice as to

all rights or defenses which the Vessel and Owner/Operator may have, none of which is to be regarded as waived, except Owner/Operator agrees to waive any objections to *in personam* jurisdiction over it, and *in rem* jurisdiction over the Vessel, with respect to the potential claims of the United States described above, in the United States court which hears the criminal action.

13.     Owner/Operator authorizes Gregory F. Linsin and Jeanne M. Grasso, of Blank Rome LLP, as agents of Owner/Operator for this Agreement, to accept service of any correspondence or legal papers relating to the Alleged Violations on behalf of the Vessel and Owner/Operator at its offices at Blank Rome LLP, The Watergate, 600 New Hampshire Avenue, N.W., Washington, D.C. 20037.  Owner/Operator agrees to enter an appearance in any criminal action brought against it in a United States court concerning the Alleged Violations, or in any civil penalty action brought against it in any other forum, and to defend the Vessel from any *in rem* criminal claim asserted against it.

14.     The United States and Owner/Operator enter into this Agreement without prejudice as to all rights or defenses, none of which is to be regarded as waived except as expressly set forth above.

15.    This Agreement may be signed in duplicate originals.


Dated: _September 3, 2015_    Pacific Breeze Fisheries, LLC
                                                    As Owner/Operator, CFV PACIFIC BREEZE

                                                    By: _____ Gregory F. Linsin
                                                            Blank Rome LLP

                                                    As attorney in fact per authority received 3 _Sept_ 2015


Dated:    3 SEP    2015    United States of America

                                                    By: _____ CDR John Dewey
                                                            U.S. Coast Guard
                                                            Staff Judge Advocate
                                                            Fourteenth Coast Guard District (dl)


12

# EXHIBIT B

# GUARANTEE LETTER

Date : 26/02/2016

I Layne C. Dupriest acting on behalf of Pacific Breeze Fisheries LLC represent that Pacific Breeze Fisheries LLC, if requested by Steve Darmody, counsel for Jeong Seon Han, Bruce Pasfield, Counsel for Tae bong Jeong, or Greg Linsin, counsel for Pacific Breeze Fisheries LLC will agree to pay for any expenses related to the return to Washington D.C of Mr. Seung Hyun Lee, previous Chief Officer of F/V Pacific Breeze, in order to secure his testimony in any trial or legal proceeding related to the current U.S. Coast Guard investigation or any subsequent U.S. Department of Justice prosecution for violations of U.S. law that arise out of the investigation. Pacific Breeze Fisheries LLC also agrees to pay all expenses related to Mr. Lee's stay in the U.S. and travel back to Korea. I further state that I am fully authorized to execute this guarantee on behalf of Pacific Breeze Fisheries LLC and to legally bind the company to the terms of this guarantee.

Layne C. Dupriest
General Manger
Pacific Breeze Fisheries LLC

27-02-16

<u>EXHIBIT C</u>

# GUARANTEE LETTER

Date : April 05, 2016

I Layne C. Dupriest acting on behalf of Pacific Breeze Fisheries LLC represent that Pacific Breeze Fisheries LLC, if requested by Steve Darmody, counsel for Jeong Seon Han, Bruce Pasfield, Counsel for Tae bong Jeong, or Greg Linsin, counsel for Pacific Breeze Fisheries LLC will agree to pay for any expenses related to the return to Washington D.C of Mr. Hyeon Tae Kim, previous Fishing Master of F/V Pacific Breeze, in order to secure his testimony in any trial or legal proceeding related to the current U.S. Coast Guard investigation or any subsequent U.S. Department of Justice prosecution for violations of U.S. law that arise out of the investigation. Pacific Breeze Fisheries LLC also agrees to pay all expenses related to Mr. Kim's stay in the U.S. and travel back to Korea. I further state that I am fully authorized to execute this guarantee on behalf of Pacific Breeze Fisheries LLC and to legally bind the company to the terms of this guarantee.

Layne C. Dupriest
General Manger
Pacific Breeze Fisheries LLC

# EXHIBIT D

# GUARANTEE LETTER

Date : April 05, 2016

I Layne C. Dupriest acting on behalf of Pacific Breeze Fisheries LLC represent that Pacific Breeze Fisheries LLC, if requested by Steve Darmody, counsel for Jeong Seon Han, Bruce Pasfield, Counsel for Tae bong Jeong, or Greg Linsin, counsel for Pacific Breeze Fisheries LLC will agree to pay for any expenses related to the return to Washington D.C of Mr. Tae Jun Son, previous Second Engineer of F/V Pacific Breeze, in order to secure his testimony in any trial or legal proceeding related to the current U.S. Coast Guard investigation or any subsequent U.S. Department of Justice prosecution for violations of U.S. law that arise out of the investigation. Pacific Breeze Fisheries LLC also agrees to pay all expenses related to Mr. Son's stay in the U.S. and travel back to Korea. I further state that I am fully authorized to execute this guarantee on behalf of Pacific Breeze Fisheries LLC and to legally bind the company to the terms of this guarantee.

Layne C. Dupriest
General Manger
Pacific Breeze Fisheries LLC

# ATTACHMENT A

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE DETAINED MATERIAL WITNESS SEAFARERS SEUNG-HYUN LEE, HYEON TEA KIM, AND TAEJUN SON | Case: |

**DECLARATION OF SEUNG-HYUN LEE IN SUPPORT OF THE MOTION TO AMEND THE CONDITIONS OF RELEASE OF MATERIAL WITNESSES OR IN THE ALTERNATIVE TO ORDER DEPOSITIONS OF WITNESSES PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 15(a)(2)**

I, Seung-Hyun Lee, declare as follows:

1.    My name is Seung-Hyun Lee.

2.    I was born on January 5, 1990.

3.    I am over eighteen years old.

4.    I am a citizen of South Korea.

5.    I speak some English.

6.    I maintain a seafarer's license.

7.    I served as the Chief Officer aboard the commercial vessel PACIFIC BREEZE ("F/V PACIFIC BREEZE") from approximately November 6, 2014 to July 10, 2015.

8.    As Chief Officer, I supported the F/V PACIFIC BREEZE's fishing operations and navigated the vessel.

9.    I never made an entry in the Oil Record Book for the F/V PACIFIC BREEZE.

10.   I know little about and never operated equipment in the engine room onboard the F/V PACIFIC BREEZE.

11. I do not know how to operate the Oil Water Separator onboard the F/V PACIFIC BREEZE.

12. I never transferred or discharged any substances from the tunnel bilge wells or the engine bilge wells onboard the F/V PACIFIC BREEZE.

13. The F/V PACIFIC BREEZE is a U.S.-flagged purse seiner.

14. The F/V PACIFIC BREEZE normally fished for skip jack and yellow-fin tuna in the Pacific Ocean.

15. On June 30, 2015, the F/V PACIFIC BREEZE arrived in Pago, Pago, American Samoa, an American territory. At that time the U.S. Immigration Service took possession of the crew's passports including mine.

16. The F/V PACIFIC BREEZE planned to unload it catch of fish in America Samoa and then go to dry dock for maintenance.

17. Between unloading the fish and going back to dry dock, the F/V PACIFIC BREEZE was scheduled for an annual inspection by the U.S. Coast Guard on July 7, 2015.

18. On July 7, 2015, the Coast Guard's Chief Warrant Officer Bryan Anderson and other U.S. Coast Guard officials began the inspection of the F/V PACIFIC BREEZE.

19. The Coast Guard's inspection took place over the next several weeks and eventually involved criminal investigators from the Coast Guard Investigative Service, as well as testing and the seizure of documents and equipment.

2

20.     As a result of that investigation, on September 3, 2015, Pacific Breeze
        Fisheries, LLC (the "Company") and the United States entered into an
        agreement, known as the Agreement on Security (the "Agreement").

21.     Under the Agreement, the United States allowed the F/V PACIFIC BREEZE
        to be released to the Company in exchange for the Company posting a surety
        bond of four hundred thousand dollars ($400,000.00).

22.     I was not a party to the Agreement.

23.     I never gave authority to the Company to represent my rights in negotiating
        the Agreement.

24.     After the Agreement was signed, the F/V PACIFIC BREEZE left American
        Samoa to continue fishing.

25.     As per the terms of the Agreement, eight individuals identified in the
        Agreement were required to stay on American Samoa.

26.     These individuals were me, Michael Thomas Sundquist, Jeong Seon Han,
        Taebong Jeong, KiChul Jun, Taejun Son, Hyeon Tea Kim, and Hyeon Park.

27.     On October 25, 2015, the Company transported all of us except Michael
        Sundquist to the State of Virginia.

28.     Since landing in Virginia, I have been living in an apartment awaiting
        completion of the government investigation and a determination that I am no
        longer needed by the government.

29.     I was interviewed by prosecutors for the U.S. Department of Justice and an
        investigator for the U.S. Coast Guard on November 16, 2015.  Since then, I

have remained continuously available for further interviews by the government, but none have been requested.

30. For approximately nine months, I have not been allowed to return to Korea.

31. I have been kept in a foreign county, away from my family, friends, and culture.

32. I miss my family, my friends, my culture, and my employment.

33. As a result of my prolonged detention I have been experiencing depression like symptoms and am currently under the care of a Korean speaking psychiatrist, Dr. Soo W. Han.

34. I have been given a meal allowance and my regular salary, but the bulk of my earnings as a chief officer is based on the vessel's catch of fish. Since I cannot fish and cannot work in the U.S., I have lost the bulk of my earnings over the last nine months.

35. My passport is not in my possession.

36. I am not free to leave the United States.

37. The United States has indicated that I will not be indicted.

38. On December 22, 2015, the United States indicated that I was not needed as a material witness in this matter.

39. Prior to receiving my passport back, counsel for Mr. Han interviewed me.

40. Mr. Han's counsel expressed an interest in using me as a witness in a potential prosecution against Mr. Han.

41. The United States has since identified me as a material witness in this matter.

4

42.     On April 6, 2016, the United States informed me that I was being named as a Material Witness because I am purportedly a material witness for Mr. Han's defense, not its prosecution of Mr. Han.

43.     On April 6, 2016, Magistrate Judge Deborah Robinson issued the following conditions of my release as a Material Witness: (1) I am to remain under the supervision of Candi Meyers of the United States Coast Guard Investigative Service; (2) I am not to be in possession of my passport; (3) I am to remain in the area of the District of Columbia; (4) I am required to return to this Court for any necessary appearance; and (5) I am to comply with the terms of any subpoena in this matter.

44.     If the Court amends the conditions of my release in a manner that allows me to return to South Korea, I will return to the United States to testify in further proceedings in this matter and surrender my seafarer's license upon return to Korea until I am no longer needed as a material witness in this matter. I am also willing to consider a reasonable bond to secure my return from South Korea.

45.     The Company has agreed to employ me for the pendency of this matter and will pay for my return trip to the United States to testify in these proceedings.


This declaration has been interpreted for me by Ms. Soo Lee Han.

I declare under penalty of perjury under the laws of the United States of America and the District of Columbia, that the foregoing is true and correct.

Executed this 22nd of April 2016 at Washington, DC.

_____
SIGNATURE

# ATTACHMENT B

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

IN RE DETAINED MATERIAL
WITNESS SEAFARERS SEUNG-
HYUN LEE, HYEON TEA KIM, AND
TAEJUN SON

Case:

**DECLARATION OF HYEON TEA KIM IN SUPPORT OF THE MOTION TO
AMEND THE CONDITIONS OF RELEASE OF MATERIAL WITNESSES OR IN
THE ALTERNATIVE TO ORDER DEPOSITIONS OF WITNESSES PURSUANT
TO FEDERAL RULE OF CRIMINAL PROCEDURE 15(a)(2)**

I, Hyeon Tea Kim, declare as follows:

1.    My name is Hyeon Tea Kim.

2.    I was born on June 6, 1971.

3.    I am over eighteen years old.

4.    I am a citizen of South Korea.

5.    I have a wife and three children ages 21, 8 and 5.

6.    I speak very little English.

7.    I maintain a seafarer's license.

8.    I served as the Fishing Master aboard the commercial fishing vessel PACIFIC

      BREEZE ("F/V PACIFIC BREEZE") from approximately November 6, 2014

      to July 10, 2015.

9.    As Fishing Master, I led and directed the F/V PACIFIC BREEZE's fishing

      operations.

10.   I never made an entry in the Oil Record Book for the F/V PACIFIC BREEZE.

11.   I know very little about the equipment or operations in the engine room of the F/V PACIFIC BREEZE.

12.   I never operated the Oil Water Separator onboard the F/V PACIFIC BREEZE.

13.   I never transferred or discharged any substances from the tunnel bilge wells or the engine bilge wells onboard the F/V PACIFIC BREEZE.

14.   The F/V PACIFIC BREEZE is a U.S.-flagged purse seiner.

15.   The F/V PACIFIC BREEZE normally fished for skip jack and yellow-fin tuna in the Pacific Ocean.

16.   On June 30, 2015, the F/V PACIFIC BREEZE arrived in Pago, Pago, American Samoa, an American territory. At that time, the U.S. Immigration Service took possession of the crew's passports including mine.

17.   The F/V PACIFIC BREEZE planned to unload its catch of fish in America Samoa and then go to dry dock for maintenance.

18.   Between unloading the fish and going back to dry dock, the F/V PACIFIC BREEZE was scheduled for an annual inspection by the U.S. Coast Guard on July 7, 2015.

19.   On July 7, 2015, the Coast Guard's Chief Warrant Officer Bryan Anderson and other U.S. Coast Officials began the inspection of the F/V PACIFIC BREEZE.

20.   The Coast Guard's inspection took place over the next several weeks and eventually involved criminal investigators from the Coast Guard Investigative Service, as well as testing and the seizure of documents and equipment.

2

21.     As a result of the investigation, on September 3, 2015, Pacific Breeze
        Fisheries, LLC (the "Company") and the United States entered into an
        agreement, known as the Agreement on Security (the "Agreement").

22.     Under the Agreement, the United States allowed the F/V PACIFIC BREEZE
        to be released to the Company in exchange for the Company posting a surety
        bond of four hundred thousand dollars ($400,000.00).

23.     I was not a party to the Agreement.

24.     I never gave authority to the Company to represent my rights in negotiating
        the Agreement.

25.     After the Agreement was signed, the F/V PACIFIC BREEZE left American
        Samoa to continue fishing.

26.     As per the terms of the Agreement, eight individuals identified in the
        Agreement were required to stay on American Samoa.

27.     These individuals were me, Michael Thomas Sundquist, Jeong Seon Han,
        Taebong Jeong, KiChul Jun, Seung Hyun Lee, Taejun Son, and Hyeon Park.

28.     On October 25, 2015, the Company transported all of us except Michael
        Sundquist to the State of Virginia.

29.     Since landing in Virginia I have been living in an apartment awaiting
        completion of the government investigation and a determination that I am no
        longer needed by the government.

30.     I was interviewed by prosecutors for the U.S. Department of Justice and a
        U.S. Coast Guard investigator on November 16, 2015.   Since then, I have

remained continuously available for further interviews by the government, but none have not been requested.

31.    For approximately nine months, I have not been allowed to return to Korea.

32.    I have been kept in a foreign county, away from my family, friends, and culture.

33.    I miss my family, my friends, my culture, and my employment.

34.    Due to the prolonged detention, I have been experiencing depression like symptoms and am currently under the care of a Korean speaking psychiatrist named Dr. Soo W. Han.

35.    My eight year old daughter is distraught over my indefinite detention and is seeing a counselor to deal with her anxiety. I am very concerned about her well-being.

36.    I am the sole source of financial supporter for my wife and children.

37.    I have been given a meal allowance and my regular salary, but as a fishing master the vast bulk of my earnings is based on the vessel's catch of fish. Since I cannot catch fish and cannot otherwise work in the U.S., I have lost the bulk of my earnings over the last nine months.

38.    My passport is not in my possession.

39.    I am not free to leave the United States.

40.    The United States has indicated that I will not be indicted.

41.    The United States has identified me as a material witness in this matter.

42.    On April 6, 2016, Magistrate Judge Deborah Robinson issued the following conditions of my release as a Material Witness: (1) I am to remain under the

supervision of Candi Meyers of the United States Coast Guard Investigative Service; (2) I am not to be in possession of my passport; (3) I am to remain in the area of the District of Columbia; (4) I am required to return to this Court for any necessary appearance; and (5) I am to comply with the terms of any subpoena in this matter.

43. If the Court amends the conditions of my release in a manner that allows me to return to South Korea, I will return to the United States to testify in further proceedings in this matter and surrender my seafarer's license upon return to Korea until I am no longer needed as a material witness in this matter. I am also willing to consider a reasonable bond to secure my return from South Korea.

44. The Company has agreed to employ me for the pendency of this matter and will pay for my return trip to the United States to testify in these proceedings.

This declaration has been interpreted for me by Ms. Soo Lee Han.

I declare under penalty of perjury under the laws of the United States of America and the District of Columbia, that the foregoing is true and correct.

Executed this 22 of April 2016 at Washington, DC.

_____
SIGNATURE

5

# ATTACHMENT C

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **IN RE DETAINED MATERIAL WITNESS SEAFARERS SEUNG-HYUN LEE, HYEON TEA KIM, AND TAEJUN SON** | Case: |

### DECLARATION OF TAEJUN SON IN SUPPORT OF THE MOTION TO AMEND THE CONDITIONS OF RELEASE OF MATERIAL WITNESSES OR IN THE ALTERNATIVE TO ORDER DEPOSITIONS OF WITNESSES PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 15(a)(2)

I, Taejun Son, declare as follows:

1.      My name is Taejun Son.

2.      I was born on August 30, 1993.

3.      I am over eighteen years old.

4.      I am a citizen of South Korea.

5.      I speak very little English.

6.      I maintain a seafarer's license.

7.      I served as the Apprentice Second Engineer aboard the commercial fishing vessel PACIFIC BREEZE ("F/V PACIFIC BREEZE") from approximately November 6, 2014 to July 10, 2015.

8.      In this role, my primary duties involved supporting the F/V PACIFIC BREEZE's fishing operations and monitoring equipment in the engine room.

9.      I never made an entry in the Oil Record Book for the F/V PACIFIC BREEZE.

10.      I never operated the Oil Water Separator onboard the F/V PACIFIC BREEZE.

11.     I never transferred or discharged any substances from the tunnel bilge wells or the engine bilge wells onboard the F/V PACIFIC BREEZE.

12.     The F/V PACIFIC BREEZE is a U.S.-flagged purse seiner.

13.     The F/V PACIFIC BREEZE normally fished for skip jack and yellow-fin tuna in the Pacific Ocean.

14.     On June 30, 2015, the F/V PACIFIC BREEZE arrived in Pago, Pago, American Samoa, an American territory.  At that time, the U.S. Immigration Service took possession of the crew's passports including mine.

15.     The F/V PACIFIC BREEZE planned to unload its catch of fish in America Samoa and then go to dry dock for maintenance.

16.     Between unloading fish and going back to dry dock, the F/V PACIFIC BREEZE was scheduled for an annual inspection by the U.S. Coast Guard on July 7, 2015.

17.     On July 7, 2015, the Coast Guard's Chief Warrant Officer Bryan Anderson and other U.S. Coast Guard officials began the inspection of the F/V PACIFIC BREEZE.

18.     The Coast Guard's inspection took place over the next several weeks and eventually involved criminal investigators from the Coast Guard Investigative Service, as well as testing and the seizure of documents and equipment.

19.     As a result of the investigation, on September 3, 2015, Pacific Breeze Fisheries, LLC (the "Company") and the United States entered into an agreement, known as the Agreement on Security (the "Agreement").

20.    Under the Agreement, the United States allowed the F/V PACIFIC BREEZE
       to be released to the Company in exchange for the Company posting a surety
       bond of four hundred thousand dollars ($400,000.00).

21.    I was not a party to the Agreement.

22.    I never gave authority to the Company to represent my rights in negotiating
       the Agreement.

23.    After the Agreement was signed, the F/V PACIFIC BREEZE left American
       Samoa to continue fishing.

24.    As per the terms of the Agreement, eight individuals identified in the
       Agreement were required to stay on American Samoa.

25.    These individuals were me, Michael Thomas Sundquist, Jeong Seon Han,
       Taebong Jeong, KiChul Jun, Seung Hyun Lee, Hyeon Tea Kim, and Hyeon
       Park.

26.    On October 25, 2015, the Company transported all of us except Michael
       Sundquist to the State of Virginia.

27.    Since landing in Virginia, I have been living in an apartment awaiting
       completion of the government investigation and a determination that I am no
       longer needed by the government.

28.    I was interviewed by prosecutors for the U.S. Department of Justice and an
       investigator for the U.S. Coast Guard on November 16, 2015. Since then, I
       have remained continuously available for further interviews by the
       government, but none have been requested.

29.    For approximately nine months, I have not been allowed to return to Korea.

30.     I have been kept in a foreign county, away from my family, friends, and culture.

31.     I miss my family, my friends, my culture, and my employment.

32.     I have been given a meal allowance and salary, but as a second engineer apprentice, about one third of my earnings is based on the vessel's catch of fish.  Since I cannot catch fish or work while in the U.S., I have lost a third of my earnings over the last nine months.

33.     My passport is not in my possession.

34.     I am not free to leave the United States.

35.     The United States has indicated that I will not be indicted.

36.     The United States has identified me as a Material Witness in this matter.

37.     On April 6, 2016, Magistrate Judge Deborah Robinson issued the following conditions of my release as a Material Witness: (1) I am to remain under the supervision of Candi Meyers of the United States Coast Guard Investigative Service; (2) I am not to be in possession of my passport; (3) I am to remain in the area of the District of Columbia; (4) I am required to return to this Court for any necessary appearance; and (5) I am to comply with the terms of any subpoena in this matter.

38.     If the Court amends the conditions of my release in a manner that allows me to return to South Korea, I will return to the United States to testify in further proceedings in this matter and surrender my seafarer's license upon return to Korea until I am no longer needed as a material witness in this matter. I am

also willing to consider a reasonable bond to secure my return from South Korea.

39.    The Company has agreed to employ me for the pendency of this matter and will pay for my return trip to the United States to testify in these proceedings.

This declaration has been interpreted for me by Ms. Soo Lee Han.

I declare under penalty of perjury under the laws of the United States of America and the District of Columbia, that the foregoing is true and correct.

Executed this 22nd of April 2016 at Washington, DC.

_____
SIGNATURE

5

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

IN RE DETAINED MATERIAL
WITNESS SEAFARERS SEUNG-HYUN
LEE, HYEON TEA KIM, AND TAEJUN
SON

Case:

**[PROPOSED] ORDER**

For Good Cause shown, the *Motion to Amend the Conditions of Release of Material*

*Witnesses or in the Alternative to Order Depositions of Witnesses Pursuant to Federal Rule of*

*Criminal Procedure 15(a)(2)* is GRANTED.

_____    The conditions of release of material witnesses of Seung-Hyun Lee, Hyeon Tea
Kim, and Taejun Son are amended as such: (1) each material witness shall have
possession of his passport; (2) each material witness may return to South Korea
on the condition that he will return to the United States as required to give
testimony in any proceeding in the above-captioned matter; or

_____    The Rule 15(a)(2) depositions of Seung-Hyun Lee, Hyeon Tea Kim, and Taejun
Son must be taken no later than fourteen days within the undersigned date. The
depositions shall be videotaped and stenographically or mechanically recorded.
Upon signing under oath their deposition transcript, the material witness will be
given their passports and released to return to their homeland of South Korea.

Date:

_____
United States District Court Judge